# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Donald Benjamin Walls, II,<br><br>    Plaintiff,<br><br>vs.<br><br>Jamiel Mohammad, individually, and in his official capacity as a City of Minneapolis Police Officer, Deitan Dubuc, individually, and in his official capacity as a City of Minneapolis Police Officer, and the City of Minneapolis,<br><br>    Defendants. | Civil File No. 12-cv- 2623 PAM/SER<br><br><br><br>**PLAINTIFF'S TRIAL BRIEF** |

## INTRODUCTION

This matter is set for jury selection and trial before The Honorable Paul A. Magnuson, Senior United States District Judge, in Courtroom 7D, 316 North Robert Street, St. Paul, MN 55101 beginning on Monday, April 7, 2014, at 9:00 A.M.

On about September 28, 2012, Donald Benjamin Walls ("Walls") sued defendants Mohammad and Dubuc under 42 U.S.C. § 1983 and Minnesota state law. In his cause of action, Walls asserted a violation of his constitutional rights – the right to be free from excessive force is clearly established under the 4th Amendment's prohibition against unreasonable seizures of the person. This memorandum is intended to outline the facts Walls intends to present at trial

# FACTS

This case arises from defendants' arrest of Walls in the early morning hours of June 8, 2009 after Walls and a group of friends were asked to leave the Hotel Minneapolis. While standing on the sidewalk near the hotel's awning, talking on a cell phone with a friend, who was coming to pick him up, Walls was shoved by Mohammad, tackled by Dubuc, and then, after being thrown to the pavement and handcuffed face-down on the concrete, he was sprayed in the face with pepper spray by Mohammad.

Walls committed no crime and presented no threat to Mohammad, Dubus or any other person. No use of force was objectively reasonable under the circumstances. Even if a jury were to accept the officers' testimony that some force was justified, it was clearly established well before this incident that it is a constitutional violation to spray pepper spray into the face of a handcuffed, nonviolent misdemeanant, who is not attempting to flee or actively resisting arrest. *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006); *Johnson v. Carroll*, 658 F.3d 819, 818 (8th Cir. 2011); *see also Rahn v. Hawkins*, 73 F. Appx. 898, 900-01 (8th Cir. 2003).

There is no video of the event, so the jury must determine what happened based on witnesses' testimony.

The incident with defendants was Walls' first and only arrest (2011 Walls Dep. 17). He has had a handful of other contacts with the police, all moving traffic violations in California (Dep. 17-18).

Walls grew up in Minneapolis and moved to Los Angeles at age 19 to pursue a career in acting and modeling (Dep. at 5-8). For the past several years he has worked

2

full-time acting in television shows and commercials, and modeling in print media. He also performs regularly as a hip-hop solo artist (Dep. 9-10). A typical workday for Walls might include filming for 8-12 hours and performing in a club at night (Dep. 10-11). Walls was recently a contestant on the reality show "America's Next Top Model", which aired in fall 2013.

Periodically Walls returns to Minnesota to stay with his mother in White Bear Lake and visit friends (and, since the incident, to see his treating physician, Dr. Bangean Abdullah). In 2009, Walls and some friends in California decided to produce a hip-hop concert at a downtown Minneapolis nightclub. They traveled to Minnesota in May 2009 to promote the show, which was scheduled for the night of June 7, 2009. Although. Walls stayed with his mom or with his friend, James Benick, for most of his visit, he and his friends decided to get two rooms at the Hotel Minneapolis for the night of the show, because they were planning to fly out to California the following day. The rooms were reserved in the name of a friend who was acting as manager for the group (Dep. 24-27).

Walls performed at about midnight on June 8, 2009. Prior to performing he had three alcoholic beverages, two mixed drinks and a glass of sparkling wine. He did not use drugs of any kind (Dep. 23). He and his friends left the nightclub at 2:00 a.m. when it closed; they went to pick up pizzas from Pizza Luce, then they returned to their hotel rooms at about 3:00 (Dep. 24, 27). Some of his friends brought a few additional guests with them.

The doors to the rooms were shut and no music was playing (Dep. 29-31). Nonetheless, someone must have complained about the noise. Walls recalls the manager

3

came up and warned them that everyone had to leave, or he would call the police (Dep. 32). Walls assumed at first that it was only the additional guests, who would have to leave; but when the manager returned a few minutes later, he understood that he would have to leave, as well. Walls told the manager he would get everyone out of his room (Dep. 32-35). He did not threaten the hotel manager (Dep. 80).

As people were packing and leaving Walls stepped out into the hallway to find Steven Sigman, a friend and fellow performer whose things were in the room; he called and discovered Sigman was downstairs outside the hotel in a car with a young lady (Dep. 38, 43). Walls tried to return to the room and get his own things, but the officers refused to let him back in. He tried to explain to the manager that he had not had enough time to get everyone out, and to see if he could move his things to the other room reserved by his friends. He was not permitted to do so. The police told him in no uncertain terms to leave the property, and the manager told him he was the one causing all the problems (Dep. 42).

Walls took the elevator downstairs and called another friend, Raji Goodman, to see if he could get a ride. Goodman and Benick told Walls they were on their way to get him (Dep. 43). Walls asked them to pick him up in front of the entrance (Dep. 47). For a while Walls waited outside the hotel in the car with Mr. Sigman and his lady friend, but eventually they needed to leave. Walls got out of the car. He called Raji and was told they were right around the corner, and he walked back toward the hotel, intending to wait under the hotel awning because it was raining heavily (Dep. 43-44, 78-79).

While Walls stood on the sidewalk under the awning talking to Goodman, one of the officers told him to leave the premises. Walls tried to tell the officer he was on the phone talking to his ride, who was just around the corner (Dep. 44-47). He did not lunge at the officers, nor attempt to hit or kick or spit at them, nor step toward them in a threatening way (Dep. 80, 2013 Dep. 39). Nonetheless, the officer pushed Walls hard enough to send him stumbling backward a few steps and to send his cell phone flying out of his hand (Dep. 47-48, 51).

Walls remembers turning around and saying, "What the fuck?" and believes he "probably raised my hands, like you gesture what's the fuck." (Dep. 48, 50). He was immediately tackled to the ground. At the time Mr. Walls stood about 6'1" tall, and weighed about 178 pounds (Dep. 48).

Mr. Walls fell to the ground with his hands out in front of him. He did not recall hearing any verbal commands to put his hands behind his back, but once on the ground voluntarily put his hands behind his back to be handcuffed and kept repeating, "I'm not resisting." (Dep. 55, 56). He was facedown and pinned to the sidewalk by an officer's knee, so could not see the officers' faces. He believes the larger of the two officers was holding him down with a knee against his shoulder, neck and head, while the officer who had pushed him was on his other side. Although he did not see who grabbed his arms and handcuffed him behind his back, he believes it was a third officer on the scene. (Dep. 52).

While he was handcuffed, Walls recalls one of the officers got close enough to "get the mace can right in my face" and sprayed him in the face and eyes (Dep. 55-56,

5

2013 Dep. 39-40).  He found it difficult to see or breathe and couldn't identify which officer pepper sprayed him (Dep. 56).  Immediately afterward he heard a female voice address people nearby who he assumed were his friends: "Get back or you're next." (Dep. 54).

The officers then threw Walls in the back of a police cruiser and drove him to the Hennepin County Adult Detention Center (Dep. 57-58).  Walls told them his face was burning from the pepper spray, and he needed to clean it off; the officers told him he would need water, told him to wait, and then stepped outside the car.  Mr. Walls heard someone say, "We got him good," and heard someone giggling (Dep. 57-58).  After a while they brought him to a fountain outside the jail intake area and let him wash off his face. Walls doesn't know exactly how long he had to wait to wash the pepper spray off his face, but it felt like a half hour (Dep. 58).  Later on, the nurse at the ADC let him wash his face more thoroughly (Dep. 64).

Walls was released from the ADC later that morning.  He collected his things from his friends and made his flight back to Los Angeles.  The next day he visited a hospital emergency room Los Angeles.  He was diagnosed with bronchitis and facial peeling due to the pepper spray (Dep. 65).  He was prescribed codeine for pain and another medication he had to take for two weeks to clear up the bronchitis (Dep. 66).

After his return to Los Angeles Mr. Walls began experiencing panic attacks for the first time in his life.  Upon a return visit to Minneapolis in November 2009 he was diagnosed with posttraumatic stress disorder (PTSD) by Dr. Abdullah (Dep. 67-68). Walls received treatment twice in California for PTSD, and now returns to Minnesota

every few months to meet with Dr. Abdullah (Dep. 67-70, 2013 Dep. at 12-13, 22-26). Mr. Walls takes Xanax and Zoloft daily to manage the symptoms of PTSD (Dep. 67, 71). His ability to seek treatment for his symptoms is limited by his lack of health insurance. (2013 Dep. 13-16, 31).

Walls was charged with misdemeanors and had to fly back to Minneapolis for a court appearance. He was represented by a public defender. The prosecutor dismissed the charges.

Walls retained the services of William T. Gaut, Ph.D., a police practices officer with 24 years of experience, who will testify via video deposition that the defendants lacked probable cause to arrest Walls for trespass and used excessive force in arresting him.

In Dr. Gaut's assessment, Mohammad unlawfully ordered Walls to leave the area and used excessive force when pushing him backward. The takedown that followed was excessive because Walls was not actively resisting nor attempting to evade arrest by flight. Finally, the use of pepper spray into Walls's face and eyes was excessive in Dr. Gaut's view, whether or not Mr. Walls was in handcuffs at the time.

If Walls was handcuffed, he offered no resistance and the use of pepper spray was excessive. Even if Walls was not yet handcuffed, given that there were three officers present, and that Walls's failure to produce his arms for handcuffing was at most non-compliant passive resistance, Dr. Gaut concludes the use of pepper spray was not justified or necessary under mandatory MPD polices that were in effect at the time of the incident.

**Punitive Damages and Attorney Fees.**

Under 42 U.S.C. §§1981 and 1983, if the jury determines that Mohammad's or Dubuc's conduct involved a reckless or a callous indifference to Walls's constitutionally protected right to be free from an unreasonable seizure of his person, the jury may award punitive damages, as well.

Sections 1981-1983 allow the recovery of attorney fees, as well.

Plaintiff is filing her motions *in limine* separate from this brief.

### ESTIMATED LENGTH OF TRIAL

Plaintiff estimates that the length for the entire trial, including jury selection and jury charge to be 3-4 days.

Dated:  24 Mar 2014                               **JAMES R. BEHRENBRINKER**
                                                  *Attorney at Law*


                                                  **/s/ James R. Behrenbrinker**
                                                  James R. Behrenbrinker
                                                  (MN Bar No. 186739)
                                                  Minneapolis Grain Exchange
                                                  400 South 4th Street, Suite 202
                                                  Minneapolis, MN  55415-1413
                                                  Tel.  (612) 294-2605
                                                  Mobile (612) 419-8400
                                                  Fax  (612) 294-2640
                                                  e-mail: JBehrenbrinker@comcast.net

                                                  and

        **KARIN CIANO LAW PLLC**

        */s/ Karin Ciano*
        Karin Ciano (MN Bar No. 343109)
        2915 Wayzata Boulevard
        Minneapolis, MN 55405
        Tel. (612) 367-7135

        **ATTORNEYS FOR PLAINTIFF**